HARRY E. SHONFELD, Appellant, v. BESSIE SHONFELD, Respondent.*

First Department, July 1, 1932.

*Jacob S. Manheimer*, for the appellant.

No appearance for the respondent.

MARTIN, J. This undefended action for the annulment of a marriage is based upon the alleged fraudulent representations of the defendant, in reliance upon which the plaintiff says he was induced to enter into the marriage contract.

The parties were married in the city of New York on July 15, 1930. The plaintiff testified that he had known the defendant for many years prior to their marriage; that they discussed marriage but that he had refused to marry the defendant because he was not financially able to do so; that in July, 1930, he had an opportunity to enter the jewelry business but he needed $6,000 to do so. He testified that the defendant, of her own volition, and for the purpose of inducing him to marry her, represented that she had $6,000 which she would give plaintiff to go into business, and an additional $2,000 with which to furnish a home. The plaintiff says that solely because of these representations he married the defendant.

Shortly after their marriage, the plaintiff says that he discovered the representations were fraudulent and immediately repudiated the marriage and has not seen the plaintiff since the day the summons and complaint were served upon her.

The Court of Appeals in *Mirizio* v. *Mirizio* (242 N. Y. 74, 83) evidently anticipated just such a case as here presented and stated quite fully the policy of the State in such matters. The court said: " In this particular case the private agreement embodies religious observances and from that standpoint is of high order. In the next case the agreement may be based on less meritorious and more selfish considerations and it requires no fertile vision to see where we may be led if the views now being urged shall prevail, that the parties by private agreement may permanently annul or indefinitely postpone the obligations which they assume when they enter into the marriage contract and defeat the policy of the State and the views which have so long and definitely prevailed in a right-minded society. In my opinion such a course as it is now suggested we ought to set out upon of recognizing modifications of the marriage contract by private agreements would lead to disruption of that contract and disaster in the attempt to enforce it. The danger always is that a court may be led by what seem in some particular case to be equitable considerations into adopting some principle which when carried to subsequent and logical application to other facts leads to results which are unfortunate and unjust."

The present case was referred to the Hon. John M. Tierney, official referee. In an opinion he stated as follows: " The com-

plaint alleges that the consent of the plaintiff to the marriage was obtained by a fraudulent representation made by the defendant. The action was not defended. To substantiate his cause of action the plaintiff testified that prior to his marriage and as a consideration of plaintiff consenting thereto the defendant herein promised to turn over to the plaintiff a substantial sum of money to enable him to engage in a proposed business venture; that, relying upon said promise, the plaintiff and his expectant partner, one Ostrow, entered into negotiations for a lease of premises to carry on the proposed business; that subsequent to the marriage and before the lease was executed, the defendant stated to the plaintiff that she had no money to advance to him and that she had none when she promised to subsidize the business.

" To obtain an annulment of a marriage under Civil Practice Act, section 1139, for fraud, plaintiff's consent must be obtained by fraudulent representations of such a nature as to deceive an ordinarily prudent person and who, relying thereon, would be induced to enter into a contract of marriage.

" The rule laid down in many decisions is that a marriage will not be annulled for fraud unless misrepresentations go to the very essence of the contract.

" The plaintiff testifies that the marriage had not resulted in a status by cohabitation. Whether that be so or not a marriage may not be annulled merely because of such a misrepresentation of financial condition as was here testified to. The multitude of similar actions brought in this jurisdiction requires the court to scan with care the reasons assigned in each case and to draw the inferences that should be drawn from the testimony."

We frequently hear it said that a contract of marriage does not differ from any other contract. To some that may be so, but to others it is much more than a simple contract. In addition, the public is interested in upholding such contracts. The State in its desire for social order and a proper development of the human race, has an interest in the marriage contract and its enforcement. The care of the offspring as well as the moral well being of both the parties to the contract and their children are matters of great concern to the State. Laws are frequently enacted to regulate and enforce marriage contracts, not only for the protection of the parties to the contract, but to safeguard society by maintaining a healthy condition of mind and body by enforcing proper moral standards, the failure to enforce which would be detrimental to society. Parties to a marriage contract may not modify, change, cancel or annul such a contract at will. For that reason, many

of these undefended matrimonial actions must be carefully scrutinized.

Attempts to use the courts in an effort to avoid the obligations incident to marriage are becoming very frequent. This case is of that character. The fact that the plaintiff was not as good a business man as he thought he was should not be sufficient to permit him to obtain the aid of the court to repudiate the contract, especially when his one concern was his self-enrichment. When such a selfish consideration alone is the inducement to marry, the State should not have much consideration for the failure of such a bargain. The interest of society at large to uphold and enforce the marriage relation is more important.

Selfishness alone should not be the sole consideration for a marriage, and where it is, as here shown, the representation which is alleged to have been false cannot be said to go to the essence of the contract. A marriage founded on a commercial basis, or a financial consideration alone, is not conducive to the betterment of society or the essential purposes of marriage.

In *Mirizio* v. *Mirizio* (*supra*, 80) Chief Judge Hiscock, writing for the court, said: " Of course, we recognize that marriage while a civil contract is, from its very nature, exempt from some of the considerations which might apply to an ordinary contract for the purchase and sale of property and, therefore, a party would not be held to violate his contract and to abandon his spouse for some inconsequential dereliction of duty which might effect a repudiation of an ordinary contract. But the refusal of husband or wife without any adequate excuse to have ordinary marriage relations with the other party to the contract strikes at the basic obligations springing from the marriage contract when viewed from the standpoint of the State and of society at large. However much this relationship may be debased at times it nevertheless is the foundation upon which must rest the perpetuation of society and civilization."

At page 83 the court said: " Our State as a matter of long-continued policy, by many statutes and innumerable decisions has fixed the status of the marriage contract as a civil contract which when once executed becomes binding and carries with it certain rights, duties and obligations and the real question presented to us in this case is whether the parties to such a contract lawfully and completely entered into may modify its effect, postpone its consummation and lessen its undoubted and fundamental obligations by private agreements between themselves."

The reason for many of the apparently inconsistent opinions found on this subject is the failure to differentiate between a

material representation which affects the marriage status and goes
to the essence of the marriage contract and a representation which
does not affect the marriage status and does not, therefore, go to
the essence of the contract. A clear illustration of that difference
is to be found in the *Mirizio Case (supra)*.

The cases relied upon to reverse this judgment deal in most
instances with material representations such as the fact that one
of the parties had been suffering from a malignant disease (*Svenson
v. Svenson,* 178 N. Y. 54), or insanity or made other representations
(*di Lorenzo v. di Lorenzo,* 174 N. Y. 467) which affected the marriage
status. The appellant relies on several cases where an annulment
was granted because the parties had agreed to submit to a religious
ceremony after the civil ceremony and refused to do so. In view
of the holding in the *Mirizio Case* (*supra*), none of these cases is
sound in principle. The distinction between the cases relied upon
and this case appears to us to be clearly pointed out in the *Mirizio
Case (supra)*.

The views here expressed and stated by our Court of Appeals
appear to be similar to those taken by the English courts which
emphasize the necessity for an enforcement of the marriage con-
tract as a benefit to the state.

In the case of *Wakefield* v. *Mackay* (1 Phillim. Ecc. 134) Sir
WILLIAM SCOTT, writing for the court, said: " Error about the
family or fortune of the individual, though produced by disin-
genuous representations, does not at all affect the validity of the
marriage. A man who means to act upon such representations
should verify them by his own enquiries; the law presumes that he
uses due caution in a manner in which his happiness for life is so
materially involved, and it makes no provision for the relief of a
blind credulity however it may have been produced."

In the case of *Ewing* v. *Wheatley* (2 Hagg. Consist. 175), in an
action brought by a wife to have a marriage set aside on the ground
that it was not regularly solemnized in that there was fraud, the
court said: " It is argued, however, that there was fraud in the
false description of himself as an esquire, as that title belongs
properly to persons of good state and quality, whereas he was a
person of low condition, and assumed that description only, to
assist his fraudulent object of getting possession of the lady, for
the sake of her fortune.

" It is certainly true that, in the description of persons, there may
be fraud that would vitiate the license; but the mere *exaggeration
of fortune* or rank will not have that effect. * * * that a
man should represent himself of superior condition or expectations
will not of itself invalidate a marriage, as the law expects that

parties should use timely and effectual diligence in obtaining correct information on such points.

" It is perfectly established *that no disparity of fortune,* or mistake as to the qualities of the person, will impeach the *vinculum* of marriage."

In *Evans* v. *Evans* (1 Hagg. Consist. 35) the subject of financial considerations is considered. It is there stated: " The law has said that married persons shall not be legally separated upon the mere disinclination of one or both to cohabit together. The disinclination must be founded upon reasons which the law approves, and it is my duty to see whether those reasons exist in the present case.

" To vindicate the policy of the law is no necessary part of the office of a judge; but if it were, it would not be difficult to shew that the law in this respect has acted with its usual wisdom and humanity, with that true wisdom, and that real humanity, that regards the general interests of mankind. For though in particular cases the repugnance of the law to dissolve the obligations of matrimonial cohabitation may operate with great severity upon individuals; yet it must be carefully remembered that the general happiness of the married life is secured by its indissolubility. When people understand that they must live together, except for a very few reasons known to the law, they learn to soften by mutual accommodation that yoke which they know they cannot shake off; they become good husbands and good wives from the necessity of remaining husbands and wives; for necessity is a powerful master in teaching the duties which it imposes. If it were once understood that upon mutual disgust married persons might be legally separated, many couples who now pass through the world with mutual comfort, with attention to their common offspring and to the moral order of civil society, might have been at this moment living in a state of mutual unkindness — in a state of estrangement from their common offspring — and in a state of the most licentious and unreserved immorality. In this case, as in many others, the happiness of some individuals must be sacrificed to the greater and more general good." (See, also, *Sullivan* v. *Sullivan,* 2 Hagg. Consist. 238, 248; *Klein* v. *Wolfsohn,* 1 Abb. N. C. 134; *Gumbiner* v. *Gumbiner,* 72 Misc. 211.)

In Bishop on Marriage, Divorce and Separation (Vol. 1, § 459) we find the following discussion on this subject: " In that contract of marriage which forms the gateway to the marriage status, the parties take each other for better, for worse, for richer, for poorer, to cherish each other in sickness and in health; consequently a mistake, whether resulting from accident, or, in general, from fraudulent

practices, in respect to the character, *fortune*, health, or the like, *does not render void what is done.*"

In section 460, Bishop says: " Should the man, in words, agree with the woman to be her husband only on condition of her being *so rich*, so virtuous, so wise, so healthy, of such a standing in society; yet, should he then celebrate the nuptials on her representing herself to possess those qualities, while in truth she did not; still in the act of marriage he says to her, in effect and in law, ' I take you to be my wife whether you have the qualities or not, and whether you have deceived me or not.' In other words, he waives the condition. To carry such a condition into the marital relation would violate its spirit and purpose, and be contrary to good morals. The objects of marriage, rightly understood, transcend all considerations of the kind; * * * surely the husband should not be permitted to repudiate his marriage, though he should discover an absence of some secondary thing to which he had given his affections, instead of placing them where he had promised. * * * To hold otherwise of fraud in present marriage would degrade a high and holy relation to the level of things of mere mercantile consideration."

If a representation such as is here urged for the annulment of the marriage were to be considered material we would doubtless be met with numerous cases where one of the parties seeking an annulment would allege that similar promises of financial support or assistance had been made by the other party. If the defendant failed to answer in the annulment action this would be a very easy manner of avoiding the marriage contract on a mere pretext.

The law is well settled that a marriage contract will not be annulled for fraud, unless the alleged misrepresentations which it is claimed induced the marriage go to the very essence of the contract. We agree with the conclusion that the alleged misrepresentations here under consideration are secondary and do not come within that class.

In this case the referee properly held that the misrepresentations by the defendant of her financial ability to invest a certain amount of money in the business of the prospective husband did not go to the essence of the marriage contract.

We are of the opinion, therefore, that the judgment dismissing the complaint should be affirmed.

FINCH, P. J., and MERRELL, J., concur; O'MALLEY and TOWNLEY, JJ., dissent and vote to reverse and direct judgment as prayed for in the complaint.

TOWNLEY, J. (dissenting). The facts are sufficiently stated in the majority opinion. On the testimony the referee found that,

for the purpose of inducing the plaintiff to consent to the marriage, the defendant " falsely and fraudulently represented that she had sufficient money to enable the plaintiff to enter into a certain business enterprise, of which the plaintiff at the time informed the defendant; that she further represented that immediately following the marriage ceremony she would advance said money to the plaintiff for the said purpose; that the defendant knew that the plaintiff entered into the marriage aforementioned relying upon the defendant's representations aforementioned.

" That as a matter of fact the representations hereinabove set forth were false and untrue; that the defendant did not have sufficient money to enable the plaintiff to enter into the business enterprise that he was contemplating; that she concealed the fact that she did not have the money; said representations were made for the purpose of inducing the plaintiff to enter into the said marriage with the defendant.

" That the plaintiff was induced to consent to the said marriage by the defendant's said representations; that he believed at the time of his marriage that the said representations were true; that if the said representations had not been made to him he would not have consented to the said marriage."

In view of these findings, the decision of the majority that a financial misrepresentation does not go to the essence of the contract is a purely arbitrary holding completely at variance with the facts of the case. It was said by the Court of Appeals in *di Lorenzo* v. *di Lorenzo* (174 N. Y. 467): " While, then, it is true that marriage contracts are based upon considerations peculiar to themselves and that public policy is concerned with the regulation of the family relation, nevertheless, our law considers marriage in no other light than as a civil contract. ( *Kujek* v. *Goldman*, 150 N. Y. 176.) The free and full consent, which is of the essence of all ordinary contracts, is expressly made by the statute necessary to the validity of the marriage contract. The minds of the parties must meet in one intention. It is a general rule that every misrepresentation of a material fact, made with the intention to induce another to enter into an agreement and without which he would not have done so, justifies the court in vacating the agreement. It is obvious that no one would obligate himself by a contract, if he knew that a material representation, entering into the reason for his consent, was untrue. There is no valid reason for excepting the marriage contract from the general rule [p. 472]. * * * If the plaintiff proves to the satisfaction of the court that, through misrepresentation of some fact, which was an essential element in the giving of his consent to the contract of marriage and which was

of such a nature as to deceive an ordinarily prudent person, he has been victimized, the court is empowered to annul the marriage" (p. 474).

In view of this clear statement of the position of the Court of Appeals, we find no justification for the attempt to whittle away the breadth of its decision because of some other view of public policy than that stated by our highest court.

After the decision in *di Lorenzo* v. *di Lorenzo (supra)*, *Svenson* v. *Svenson* was decided by the Court of Appeals (178 N. Y. 54). That case involved an action for an annulment because of the discovery after marriage and before consummation that the husband had a venereal disease. The Court of Appeals affirmed *di Lorenzo* v. *di Lorenzo* and cited with approval from standard text writers on domestic relations as follows: " ' Marriage begins by contract and results in a status. If, before children are begotten, before debts are created, real estate involved, and the community have long recognized the relation, the injured party seeks relief from fraud, error or duress, it seems clear that no consideration of public policy will prevent a court from annulling a marriage where the relation has not fully ripened into the complications of a public status. In such case the marriage is but little more than a contract; and, in view of the serious consequences to follow, the degree of fraud which vitiates a contract should be sufficient.' (Nelson on Marriage and Divorce, § 600.) ' Where there has been no consummation, any fraud which would be sufficient to annul a contract should in reason be sufficient to annul a marriage ceremony. No satisfactory reason of the law will justify the courts in declaring valid such a contract of marriage when tainted with fraud or duress where the only effect will be the punishment of the innocent and the confiscation of his or her property by the deception. If the marriage is declared valid it will exist in name only, preventing both parties from marrying again and bringing the marriage relation into disrepute. Every reason for relief from fraud is applicable here, where a denial of relief is fraught with evil consequences much greater than those flowing from ordinary contracts.' (Id. 602.) ' Whatever of fraud, of error, or duress will vitiate any other contract, should ordinarily be received as sufficient to vitiate the mere marriage contract, whether executory or executed, viewed as a thing separate from the consummation which follows.' (1 Bishop on Marriage and Divorce, § 166 *et seq.*) "

For further discussion of the cases on the subject, see the opinion of LAZANSKY, J., in *Griffin* v. *Griffin* (122 Misc. 837).

The conclusion appears inescapable that at least before consummation of the marriage misrepresentations of property are

as much a cause for an annulment as misrepresentations concerning health (*O'Connell* v. *O'Connell*, 201 App. Div. 338) or promises for a further religious ceremony (*Rutstein* v. *Rutstein*, 221 App. Div. 70; *Aufiero* v. *Aufiero*, 222 id. 479).

The view expressed in the prevailing decision was once the law of this State (*Fisk* v. *Fisk*, 6 App. Div. 432), but was changed by the Court of Appeals in the *di Lorenzo* case. For the last thirty years the Supreme Court in this State has been following the broad general doctrine of the *di Lorenzo* case and has been habitually granting annulment under circumstances similar to the present facts. (*Robert* v. *Robert*, 87 Misc. 629; *Sheridan* v. *Sheridan*, 186 N. Y. Supp. 470; *Truiano* v. *Truiano*, 121 Misc. 635.)

The judgment should be reversed and judgment directed as prayed for in the complaint.

O'MALLEY, J., concurs.

Judgment affirmed, without costs.