CHRISTINE CIVELLO CERVONE, Plaintiff, *v.* ARMAND CERVONE, Defendant.

Supreme Court, New York County, May 21, 1935.

*Neill Rife,* for the plaintiff.

No appearance for the defendant.

TIERNEY, JOHN M., Official Referee. The plaintiff by this action demands judgment that her marriage with the defendant be annulled and declared void. It is uncontested.

Her complaint alleges " that for the purpose of inducing the plaintiff to consent to said marriage the defendant falsely and fraudulently represented that he was a doctor of medicine and held the degree of doctor of medicine from a reputable and accredited Italian medical college and university, and that he had all of the qualifications and prerequisites necessary to qualify him for the New York State examination of those seeking a license to practice medicine and surgery in the State of New York, and that he intended to qualify for and take such examination within a short time, and that he was able to and would pass such examination, and would be licensed by the authorities of the State of New York to practice medicine and surgery, and plaintiff, relying thereon, agreed to marry defendant as aforesaid."

She further alleges that she was induced to consent to the said marriage solely by reason of the defendant's representations and promises; that she believed them to be true; that if they had not been made, she would not have consented to the marriage; that they were false and untrue; that she had requested the defendant since their marriage to submit to said examination to become

licensed as a physician, doctor and surgeon in the State of New York, but that the defendant has always refused and still refuses to do so; that she has never cohabited nor lived with the defendant since the discovery of the falsity of those representations, and that there is no issue of the marriage.

On the hearing before me she testified that she was born and educated in the city of New York, and was employed in a prominent financial institution here; that her brother, with whom she lived at the time, is a practicing physician in the borough of the Bronx; that she was willing to be the wife of a doctor, to have a standing like her brother's wife. Her dominating impulse seems to have been the desire to marry a doctor. He was thirty-nine years old; she twenty-five, at the time of their marriage. The defendant had courted her for a period of eight months before their marriage, which was performed before the city clerk in the presence of her brother (the physician), her father and sisters. She was given a dowry of $11,000. She and the defendant took up housekeeping and lived together as husband and wife for more than five years. During all that time he did no work and they lived on her dowry and moneys she earned. He failed to take up studies to fit him as a physician, and she left him last year. During the years they lived together she made no effort to ascertain the truth or falsity of his alleged statements respecting his education, nor was any made by her brother, the physician. He had represented to her that he had a degree from the University of Naples, Italy.

Whether or not he had such a degree could have been easily ascertained by appropriate inquiry during the eight months of their courtship, or the five years of their cohabitation. Apparently no effort was made in this direction.

In December of last year she told him he would have to do something, " and in a rage, in a terrible rage * * * he admitted to me that he did not have a license * * * how did I expect him to go up there and take his state examinations when he did not have the qualifications. So then I told my folks about it. He admitted to me — it slipped out of his mouth * * * he had started to study medicine, but he never got his degree in Europe, and he certainly could not apply, try and take his examinations here." Her brother " is a pretty successful doctor, very much so." A little time before she left him she consulted this brother and he thought it best not to bother any more, so she left him and commenced this action. She further testified that she did not know where he is now.

Her brother, a graduate of New York University and Medical School, practicing since 1923, testified that he met the defendant

before he and his sister were married and had many conversations with him; that the defendant told him he had a degree from the University of Naples; that he was a doctor of medicine and came to this country in order to "make good;" that he accepted these statements without investigation. He learned their falsity through serious talking with him and taking him to various hospitals. He found out he was not a physician, that he lied to him when he told him he was a physician. He then told his sister, the plaintiff, that he could not keep on giving her money to support the defendant and she left him.

It seems to be significant, having in mind the testimony of the plaintiff that she did not know where the defendant now is, that the process server who served the summons and complaint in this action testified that he was accompanied to defendant's home in the Bronx by the father of the plaintiff; that he watched his house a month previously; that he has a sign as a doctor there, " and I saw many clients come in that morning for treatments and all that. Q. You did not see any sign for a Doctor on his house? A. M. D." When he served the summons and complaint on defendant " at his premises 2043 Ellis avenue, Bronx [his affidavit of service designates the house number as 2041], I explained to the man all about it and he told me he was going to get an attorney, and he would take care of the matter."

The defendant failed to appear, answer or make any motion addressed to the complaint. In the list of subscribers in the Borough of the Bronx, New York Telephone Directory for 1935, is found " Cervone, Armand, M. D., 2041 Ellis Avenue." Whether the action is collusive I leave to inference.

The case is barren of any competent evidence that the defendant has not a diploma from the University of Naples as medical doctor, which he represented he had, or of whether or not he has been admitted to practice medicine here. We have only the testimony of the plaintiff and her brother that he stated before his marriage that he had such a diploma and after marriage that he had not. Such a diploma would be a physical thing to be seen on production, but apparently he was not asked to produce it. If the plaintiff did rely on that representation in accepting his proposal of marriage the inquiry arises why did not she or her brother, who presumably had a diploma from the New York University, ask him to produce it. This suggests an atmosphere of suspicion of the truth of her testimony and that of her brother.

If the representations were made and were false and the defendant is a false and fraudulent person, the plaintiff would have the sympathy of every right-minded person in the misfortune that is

hers; but actions such as this must be determined on competent evidence.

The reasoning in the minority opinion of Judge (now Chief Judge) CRANE in *Shonfeld* v. *Shonfeld* (260 N. Y. 477), which was an undefended action for annulment heard by me and in which I recommended the dismissal of the complaint, seems particularly appropriate to this case. I quote (p. 482): " The marriage in this case was a mere matter of bargain and sale. The woman bought the man for $6,000, and because she failed to have the money the man seeks to have the marriage annulled. The question really is whether the marriage ceremony in this state is of any binding force or whether it is an empty ceremony * * * (p. 484). The representations which would justify an annulment must be material; (2) the representations must be such as to deceive the ordinarily prudent person * * *. Let me call attention * * * to this second element of an annulment action which is as important as the material false representation. Before the law all are measured by the standard of the reasonably prudent and careful man. Even in annulment actions one is not to be relieved by the courts if he is so stupid and foolish as to believe statements which his own eyes and ears could have discovered to be false in exercise of a little care. Neither are the judges and the courts to be fooled in an undefended annulment action by the whimper of a party that he was deceived when he has no one to blame but himself. The law makes no adjustments of those marital difficulties brought about by a person's own indifference to and disregard of his own welfare. Care and caution are required and have been emphasized in all the cases dealing with this subject of annulment for fraud * * * (p. 485). Love is blind, but in this case there was no love. The plaintiff concedes it was a purely commercial transaction. He, therefore, failed to exercise any care or caution, and has only himself to blame for his predicament. As Lord STOWELL said in *Wakefield* v. *Mackay* (1 Phill. Ecc. 134, cited in 1 Bishop on Marriage and Divorce [6th ed.], § 167): ' A man who means to act upon such representations should verify them by his own inquiries; the law presumes that he uses due caution in a matter in which his happiness for life is so materially involved, and it makes no provision for the relief of a blind credulity however it may have been produced ' * * * (p. 486). While marriage in this State is a civil contract, meaning thereby that it takes its validity and binding force from State laws, and not through religious ordinances, the marriage contract is more than a civil contract, which deals merely with property rights. From its very nature it establishes a status from the time of the contract and not from the time

of consummation or cohabitation (p. 487). * * * The public policy of this State, as of all other States in this Union, plays an important part in the marriage contract. (*Wade* v. *Kalbfleisch*, 58 N. Y. 282, 284; *Maynard* v. *Hill*, 125 U. S. 190.) The married couple cannot do as they please with the marriage contract. Whatever may be their freedom of action regarding their own morals the law does not view marriage lightly or leave it to them to destroy at will. * * * A warning of the fraud which might be attempted in annulment actions under the very broad words of the *di Lorenzo Case* (174 N. Y. 467) was given in the critical notes upon this subject to be found in 1 Cornell Law Quarterly, 48, and 6 Cornell Law Quarterly, 199; 24 Harvard Law Review, 157 (p. 488). We must recognize that the marriage contract can never be on a par with other civil contracts because of its very nature. Other contracts deal with money values or property interests; not so the marriage contract. Money damages can be ascertained at least by approximation for the breach of a civil contract and even for the breaking of a promise to marry, but no such element finds place in the contract of marriage itself. The utmost the law can do is to dissolve the status for fraud or for disability. Every jurisdiction recognizes that marriage procured by false and fraudulent representations may be annulled in equity. What are the false and fraudulent representations which the courts will consider material? The difference in opinion as found in the decisions is over this question of materiality. Surely every representation leading up to marriage cannot be material — the fact that a brunette turned to a blonde over night, or that the beautiful teeth were discovered to be false, or the ruddy pink complexion gave way suddenly to pallor, or that a woman misstated her age or was not in perfect health would lead no court to annul the marriage for fraud. This court said in *Lapides* v. *Lapides* (254 N. Y. 73, p. 80): ' The fraud which may dissolve the marriage tie must relate to something vital.' And in section 167 of Bishop on Marriage and Divorce (Vol. 1, [6th ed.]) we find the almost universal rule to be that ' In that contract of marriage which forms the gateway to the marriage status, the parties take each other for better, for worse, for richer, for poorer, to cherish each other in sickness and in health; consequently a mistake, whether resulting from accident, or, in general, from fraudulent practices, in respect to the character, fortune, health, or the like does not render void what is done ' (p. 489).

" Fraud assumes many different forms and it has always been impossible to predict just how it will appear. No definite rule can be stated for matrimonial actions any easier than it can be stated for any other class of fraud actions. We may say, however, that

because of the importance of the marriage contract and the status established thereby the courts will not treat the matter lightly and will only deal with those representations which are serious, grave and important; the representations must be proved by clear and convincing evidence to have been a vital and dominant element in entering into the contract. What induces a man to marry a woman? Who can tell? Are the judges wiser than other men? This is a matter which better not be inquired into too inquisitively as it has baffled the philosophers of all ages. Law moves not upon supposition or guess but upon evidence. The false representations inducing a marriage must be so weighty and material that the courts can say that they would have influenced the consent of a man of average intelligence and prudence. (See *Beard* v. *Beard*, 238 N. Y. 599; *Minner* v. *Minner*, 238 N. Y. 529; *Svenson* v. *Svenson*, 178 N. Y. 54.)

" * * * There may be occasions when representations as to who and what a person is may be very vital in procuring the consent to marriage. These matters are given attention by careful persons in entering into matrimony. Deception as to these circumstances may lead to annulment, but the courts have not yet gone so far as to recognize marriage as a mere matter of bargain and sale or to annul it because one of the parties is disappointed in the material wealth of the other (p. 489).

" * * * Most of the annulment cases upon the ground of fraud are defaults. The parties seek by this easy means to obtain a decree dissolving the bonds of matrimony. In a divorce case based upon adultery the innocent party is prohibited from testifying. Whatever he or she knows about the guilt of the other cannot be told. Not so in annulment cases. The plaintiff becomes a ready witness and glibly recites his or her story in the absence and default of the other party. This has led the courts to say that the proofs should be strong and convincing in these annulment cases, and that the false representations must go to a vital part of the marriage contract. It should clearly appear not only that the representations were made but that the facts stated were of such weight and seriousness as to induce reasonable persons similarly situated to rely and act upon them."

This is a clear expression of morals and the law applicable to the marriage contract in this State.

And in the same case Mr. Justice MARTIN (now Presiding Justice) in the Appellate Division, First Department, writing for the majority court (236 App. Div. 271), sustaining the dismissal of the complaint, says: " We frequently hear it said that a contract of marriage does not differ from any other contract. To some that may be so, but

to others it is much more than a simple contract. In addition, the public is interested in upholding such contracts. The State in its desire for social order and a proper development of the human race, has an interest in the marriage contract and its enforcement. The care of the offspring as well as the moral well-being of both the parties to the contract and their children are matters of great concern to the State. Laws are frequently enacted to regulate and enforce marriage contracts, not only for the protection of the parties to the contract, but to safeguard society by maintaining a healthy condition of mind and body by enforcing proper moral standards, the failure to enforce which would be detrimental to society. Parties to a marriage contract may not modify, change, cancel or annul such a contract at will. For that reason, many of these undefended matrimonial actions must be carefully scrutinized.

" Attempts to use the courts in an effort to avoid the obligations incident to marriage are becoming very frequent. This case is of that character. The fact that the plaintiff was not as good a business man as he thought he was should not be sufficient to permit him to obtain the aid of the court to repudiate the contract, especially when his one concern was his self-enrichment. When such a selfish consideration alone is the inducement to marry the State should not have much consideration for the failure of such a bargain. The interest of society at large to uphold and enforce the marriage relation is more important. * * *

" The reason for many of the apparently inconsistent opinions found on this subject is the failure to differentiate between a material representation which affects the marriage status and goes to the essence of the marriage contract and a representation which does not affect the marriage status and does not, therefore, go to the essence of the contract."

In the case of *Wakefield* v. *Mackay* (1 Phill. Ecc. 134) Sir WILLIAM SCOTT, writing for the court, said: " Error about the family or fortune of the individual, though produced by disingenuous representations, does not at all affect the validity of the marriage. A man who means to act upon such representations should verify them by his own enquiries; the law presumes that he uses due caution in a manner in which his happiness for life is so materially involved, and it makes no provision for the relief of a blind credulity however it may have been produced."

In the case of *Ewing* v. *Wheatley* (2 Hagg. Consist. 175), in an action brought by a wife to have a marriage set aside on the ground that it was not regularly solemnized in that there was fraud, the court said: " It is argued, however, that there was fraud in the false description of himself as an *esquire*, as that title belongs properly

to persons of good state and quality, whereas he was a person of low condition, and assumed that description, only, to assist his fraudulent object of getting possession of the lady, for the sake of her fortune.

" It is certainly true, that, in the description of persons, there may be fraud, that would vitiate the license; but the mere exaggeration of fortune or rank will not have that effect. * * * That a man should represent himself of superior condition or expectations, will not, of itself, invalidate a marriage, as the law expects, that parties should use timely and effectual diligence in obtaining correct information on such points.

" It is perfectly established, that no disparity of fortune or mistake as to the qualities of the person, will impeach the *vinculum* of marriage."

In *Evans* v. *Evans* (1 Hagg. Consist. 35) the subject of financial considerations is considered. It is there stated: " The law has said that married persons shall not be legally separated upon the mere disinclination of one or both to cohabit together. The disinclination must be founded upon reasons which the law approves, and it is my duty to see whether those reasons exist in the present case.

" To vindicate the policy of the law is no necessary part of the office of a judge; but if it were, it would not be difficult to shew that the law in this respect has acted with its usual wisdom and humanity, with that true wisdom, and that real humanity, that regards the general interests of mankind. For though in particular cases, the repugnance of the law to dissolve the obligations of matrimonial cohabitation, may operate with great severity upon individuals; yet it must be carefully remembered, that the general happiness of the married life is secured by its indissolubility. When people understand that they *must* live together, except for a very few reasons known to the law, they learn to soften by mutual accommodation that yoke which they know they cannot shake off; they become good husbands, and good wives, from the necessity of remaining husbands and wives; for necessity is a powerful master in teaching the duties which it imposes. If it were once understood, that upon mutual disgust married persons might be legally separated, many couples, who now pass through the world with mutual comfort, with attention to their common offspring and to the moral order of civil society, might have been at this moment living in a state of mutual unkindness — in a state of estrangement from their common offspring — and in a state of the most licentious and unreserved immorality. In this case, as in many others, the happiness of some individuals must be sacrificed to the greater and more general good." (See, also, *Sullivan* v. *Sullivan*, 2 Hagg.

Consist. 238, 248; *Klein* v. *Wolfsohn*, 1 Abb. N. C. 134; *Gumbiner* v. *Gumbiner*, 72 Misc. 211.)

The law is well settled that a marriage contract will not be annulled for fraud unless the alleged misrepresentations which it is claimed induced the marriage go to the very essence of the contract.

The cause of action there was lack of money; in this case lack of collegiate education is claimed. In some of our sister States and in some foreign countries various causes are assigned as sufficient for the annulment of a marriage, some apparently inconsequential, but I have not found any which hold such a cause as here to be a proper ground, certainly not in the judicial decisions in our State. Here we have a status resulting from cohabitation for a period of over five years. The State has a concern in such a situation. The court will not destroy it because of claimed lack of collegiate education of one of the parties, even if such a condition were a fact.

Formal marriage throughout all the States consists in having the celebration take place before a clergyman or before some civil officer designated by statute, or both. In the case at bar, if it be argued that the marriage of the parties was by a civil ceremony only and, therefore, is more susceptible of dissolution than if it were religious, the answer is that it was performed by authority of law vested in the person before whom it was so performed. It is, therefore, as binding as would be one performed before a clergyman of the highest ecclesiastical dignity.

Marriage in one form or another is the oldest institution of society and the source of its most ancient laws. From time immemorial in civilized communities it has been regarded as a spiritual as well as a physical union of man and woman to continue " until death do us part." From time to time the press reports occurrences that would seem to indicate that this has been lost sight of and that it is regarded by some largely as a temporary condition entered into for social or pecuniary advantage to be terminated at the whim of either or both parties when disappointment or satiety ensues. In this State of New York it will not be set aside and treated as null or rescinded for either party or both at pleasure.

There is no competent evidence in this case that would warrant a judgment for the plaintiff either in law or in morals. The complaint should be dismissed. Proposed findings passed upon.